IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | No. 22-340-1 |
| | : | |
| JAMES WATTS | : | |

## MEMORANDUM

**Judge Juan R. Sánchez**                                                                                      **August 29, 2025**

Defendant James Watts moves to suppress all evidence stemming from the search of two vehicles, arguing that law enforcement lacked reasonable suspicion to conduct the initial traffic stop that resulted in the searches. Because law enforcement had reasonable suspicion to stop the first vehicle—both for traffic violations and for narcotic and firearm offenses—the stop was lawful. Accordingly, the motion to suppress will be denied.

**FINDINGS OF FACT**

1.      Beginning late fall 2019, the Philadelphia Division of the FBI received information related to a group known as the Crown Royal Gang, believed to be responsible for drug trafficking and violence in the Frankfurt section of Philadelphia. Tr. Suppress Hr'g 7/30/25 at 27:4-9, ECF No. 101. The information indicated that the leader of Crown Royal Gang was James Watts. *Id.* at 27:9-10. After receiving this information, the FBI began its own investigation into the Crown Royal Gang, including background checks, social media analysis, and a narcotics investigation. *Id.* at 27:24-25, 28:1-11.

2.      Through its investigation, supported by the use of a pole camera, the FBI observed activity was taking place at the Oxford Village Housing Project within Frankfurt. *Id.* at 28:12-25, 29:1-10. The pole camera captured footage roughly 24 hours a day from October 27, 2020 to March 2021, which was later reviewed by law enforcement. *Id.* at 30:2-21.

3. When reviewing the footage captured by the pole camera, law enforcement noticed Crown Royal Gang members—James Watts, Shakoor Swinton, Tyheem Tyler, and Cookie Bundy—congregating in the parking lot of the Oxford Village Housing Project. *Id.* at 31:5-13. Law enforcement also noticed a stationary yellow Ford van (PA tag ZRA 1465) that never moved from the parking lot and was registered to James Watts. *Id.* at 32:9-13, 33:10-20. CRG members, including James Watts, were observed frequently coming and going from the van to place items in the van and take items out, including bags, that were then placed in other vehicles including a white Acura. *Id.* at 32:16-24, 37:2-6. Those items also included what law enforcement believed to be firearms. *Id.* at 32:24-25, 33:1-2.

4. Law enforcement also observed what they believed were hand-to-hand transactions, in which James Watts would remove an item from the van and provide it to an individual in exchange for U.S. currency. *Id.* at 33:1-4. Officers observed "countless" similar transactions throughout the investigation, leading them to believe the yellow van "served no other purpose than to be maintained as a drug stash and firearms premises." *Id.* at 33:4-9.

5. On November 10, 2020, Watts opened the yellow van and removed a black plastic bag. *Id.* at 34:17-18, 36:21-25. That same day, law enforcement observed Watts place or remove items from the van on two other occasions, including a white plastic bag. *Id.* at 36:21-25; 37:21-25; 38:17-21.

6. On November 11, 2020, Watts parked the white Acura in the parking lot and removed an item from the yellow van. Watts removed a large white bag from the van and walked back to the white Acura. Later that day, Watts returned to the van carrying what appeared to be a white plastic bag, coming from the area where the Acura was parked. *Id.* at 39:13-23; 40:5-25.

7.    On November 13, 2020, Watts opened the yellow van using a set of keys and removed bulky items from the van, placing them in his sweatshirt. *Id.* at 42:2-17.

8.    On November 14, 2020, law enforcement again observed Watts by the yellow van carrying a white plastic bag and what appeared to be a firearm in the front pocket of his sweatshirt. *Id.* at 43:20-25, 44:1-3.

9.    On November 18, 2020, Watts removed a small white object from the yellow van and appeared to conduct a brief hand-to-hand exchange with an individual in a nearby vehicle, and then returned to the yellow van. *Id.* at 45:21-25; 46:6-20; 47:2-18.

10.   On November 24, 2020, Watts retrieved an item from the yellow van and appeared to conduct a hand-to-hand transaction with an individual in a nearby vehicle. Law enforcement observed that individual counting money and placing the item he received from Watts into his pocket. *Id.* at 48:9-25; 49:1-4.

11.   On November 25, 2020, Watts retrieved a gun box from what appeared to be the white Acura and provide it to Shakoor Swinton, who carried it to the yellow van. *Id.* at 50:2-25; 51:2-13.

12.   From December to February 2021, law enforcement observed Watts continue to go to and from the yellow van and take items out of the van. *Id.* at 53:8-19. During that time, Watts continued to drive the white Acura. *Id.* at 53:20-22.

13.   In the afternoon of March 12, 2021, law enforcement observed James Watts unlock the yellow van, remove a black plastic bag, and head directly to the white Acura. *Id.* at 54:8-24; 55:1-13; 59-:11-12.

14.   At that point, FBI agents decided to conduct an enforcement action "to get the Acura or whoever was carrying the bag stopped to confirm our suspicions that there will indeed be narcotics being stored in that yellow van." *Id.* at 59:10-16. FBI Special Agent William Becker then

coordinated with other task force officers, informing them of the ongoing narcotics investigation and that the vehicle in question was the white Acura. *Id.* at 59:16-25; 60:2-15. Special Agent Becker asked PPD officers to identify their own probable cause to stop the vehicle and provide that reason to Watts so officers would not need to reveal information about the underlying FBI investigation. *Id.* at 60:16-25; 61:1-11.

15. Philadelphia Police Department officers Sean Burgess and Corey Farrell were on patrol on March 21, 2021 and were contacted by the FBI regarding a white Acura that was the target of a narcotics investigation. *Id.* at 10:2-14. The officers spotted the white Acura driving eastbound on Devereaux Avenue, during which they noticed "through the back window that there was a crack in the passenger side windshield" and that the driver and passenger side front windows were tinted. *Id.* at 100:17-22. At that point, officers activated their lights and sirens and initiated a vehicle stop at approximately 2:50 P.M. *Id.* at 100:22-24; 92:20-22.

16. Former PPD Task Force Officer John Krewer, who was also present during the traffic stop, also testified to the existence of the crack in the windshield. *Id.* at 89:3-19. Krewer testified that "you could see the cracked windshield through the back of the car" and that it was "clear as day." *Id.* at 89:3-9.

17. Photographs taken after the white Acura had been impounded showed that the windows were tinted, and that the windshield had a large hairline crack on the passenger side. Gov't Exh. 13-16.

18. During the traffic stop, PPD Officer Burgess conducted a check of Watts's license, during which he found that the license was suspended. *Id.* at 102:17-20. A later review of a certified copy of Watts's driving record confirmed that on March 12, 2021, his license was suspended. *Id.* at

62:10-13. Driving a vehicle without a license is a violation of Section 1501A of the Pennsylvania Motor Vehicle Code. *Id.* at 90:11-13.

19. At that point, officers were deciding between two options: either (1) "live stop" the white Acura and tow it to a Philadelphia Parking Authority lot to inventory the vehicle's contents or (2) request a police K-9 to come for a narcotics inspection. *Id.* at 90:3-22; 91:4-13; 103:10-16. Law enforcement ultimately requested a K9 unit for a narcotics inspection of the vehicle. *Id.* at 90:15-20.

20. Law enforcement informed Watts he was free to leave. *Id.* at 92:2-8.

21. At 3:50 P.M., the K9 unit arrived and positively indicated on the vehicle. Law enforcement decided to tow the vehicle to the FBI for a search warrant. *Id.* at 92:1-7, 93:6-8. The K-9 unit was then directed to conduct an exterior search of the yellow van. *See id.* at 111:14-23.

**DISCUSSION**

Watts challenges the stop of the Acura as unlawful for lack of reasonable suspicion. The Government argues law enforcement had reasonable suspicion to stop Watts based on observed traffic violations and also had probable cause to stop the vehicle for narcotics and firearm offenses. Because the stop of the Acura was supported by reasonable suspicion, the search was lawful. The motion to suppress will be denied.

The Fourth Amendment protects against unreasonable searches and seizures. U.S. Const. amend. IV. Traffic stops are considered seizures under the Fourth Amendment and may only occur when a law enforcement officer has a "reasonable, articulable suspicion that criminal activity is afoot." *United States v. Delfin-Colina*, 464 F.3d 392, 396 (3d Cir. 2006) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)); *see Terry v. Ohio*, 392 U.S. 1 (1968). "Reasonable, articulable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *Delfin-Colina*, 464 F.3d at 396 (citation

and quotation marks omitted). In analyzing the reasonableness of a traffic stop, a court should consider the totality of the circumstances and ask whether the "specific, articulable facts produced by the officer would support reasonable suspicion of a traffic infraction." *Id.* at 397-98.

Watts challenges the traffic stop by arguing that officers lacked reasonable suspicion of a traffic infraction because the crack in Watts's windshield did not obstruct the driver's view, and law enforcement lacked reasonable suspicion of criminal activity more generally. Both arguments fail. To conduct a traffic stop, an officer needs only to have reasonable, articulable suspicion of a traffic infraction. *Id.* at 397-98. Whether it turns out that the traffic infraction actually occurred is immaterial to the analysis. PPD Officer Burgess credibly testified to noticing a crack in the windshield of the white Acura, which was sufficient to give rise to the reasonable suspicion that Watts had violated Section 4524(a) of the Pennsylvania Motor Vehicle Code. That section prohibits an individual from driving a motor vehicle with any "nontransparent material upon the front windshield which materially obstructs, obscures or impairs the driver's clear view of the highway." 75 Pa. C.S.A. § 4524(a).[1] Moreover, PPD Officer Burgess also credibly testified to the white Acura's tinted windows, which presented yet another basis for the traffic stop. Excessive tint is a violation of Section 4524(e)(1) of the Pennsylvania Motor Vehicle Code, which prohibits an individual from driving a motor vehicle with "any sun screening device or other material which does not permit a person to see or view the inside of the vehicle through the windshield, side wing or side window of the vehicle." *Id.* § 4524(e)(1). Both the crack and the tinted windows provided

---

[1] Watts argues that the conflicting testimony as to the location of the crack—whether it was on the passenger side or the center—further supports his contention that the stop was unlawful. However, the existence of the crack would give rise to reasonable suspicion of a traffic infraction whether officers observed the crack in the center or on the passenger side of the vehicle. This minor discrepancy does not change the analysis.

PPD officers with reasonable suspicion that Watts had committed a traffic infraction. As such, they were justified in conducting the stop.

Beyond the reasonable suspicion of a traffic infraction, law enforcement was further justified in conducting the traffic stop because they had probable cause to believe the white Acura contained evidence of narcotics trafficking. The interest in both James Watts and the white Acura stemmed from a months-long FBI investigation in which law enforcement observed James Watts perform hand-to-hand transactions and move items—including items believed to be firearms and narcotics—from the yellow van into vehicles including the white Acura. On the day of the traffic stop, law enforcement observed Watts remove a black plastic bag from the yellow van and place it into the white Acura. Based on law enforcement observations and years of experience, law enforcement had probable cause to believe James Watts possessed controlled substances and/or firearms, and that those items were present in the white Acura on the day of the traffic stop. Combined, this information provided law enforcement with probable cause—more than the required reasonable suspicion—to stop the white Acura.[2]

In addition to challenging the basis for the stop of the white Acura, Watts also challenges the K9 sniff of the vehicle as a violation of *Rodriguez v. United States*, 575 U.S. 348 (2015), arguing the "hour plus delay violated the 4th Amendment." ECF No. 104 at 7. This argument is

---

[2] The Court understands Watts's motion as challenging the stop as unlawful. *See* Tr. 9:17-23, ECF No. 92. To the extent he is challenging the search as unlawful, that challenge will also fail. Under the "automobile exception," law enforcement may search a vehicle as long as there is "probable cause to believe [the] vehicle contains evidence of criminal activity." *U.S. v. Cobb*, 483 Fed. App'x. 719, 723 (3d Cir. 2012) (citing *Arizona v. Gant*, 556 U.S. 332, 347 (2009)). To determine whether probable cause existed, a court must consider the "totality of the circumstances to determine whether there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* At 724. As previously discussed, based on the months-long FBI investigation, law enforcement had probable cause to believe the white Acura contained evidence of narcotics trafficking.

also unavailing. Under *Rodriguez*, "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Id.* at 350. The "critical question" to this determination is "whether conducting the [dog] sniff 'prolongs'—*i.e.,* adds time to—the stop." *Id.* at 257. Here, the K9 sniff did not prolong the stop in violation of *Rodriguez* because Watts's suspended license meant he was not permitted to drive the white Acura away under any circumstances. Moreover, by the time the K9 unit arrived, Watts himself was free to go.

**CONCLUSION**

Because the underlying stop of the white Acura was lawful, there is no basis to suppress the evidence obtained from the search of that vehicle nor the evidence obtained from the yellow van as fruits of the poisonous tree. Law enforcement had reasonable suspicion of a traffic infraction based on the windshield crack and the tinted windows. Moreover, law enforcement also had probable cause—more than the reasonable suspicion required—that the white Acura contained evidence of narcotics trafficking. Watts's motion to suppress will be denied.

An appropriate order follows.

BY THE COURT:


  /s/ Juan R. Sánchez
Juan R. Sánchez, J.